## L. D. BURGER *vs.* NORTHERN PACIFIC RAILROAD COMPANY.

### January 27, 1876.

Conversion—Evidence of Value in the Absence of Market Value.—This is an action for the recovery of damages for the conversion, in the late fall and winter of 1871, of eighty tons of hay. At the time of the conversion the hay was in stack at the second crossing of the Cheyenne river, on the line of the Northern Pacific Railroad, about sixty miles west of the Red River of the North, and 140 miles east of the Missouri river. There was no market value for hay at the place, nor at any other place within a distance reasonable for the purpose of transporting hay. The region where the hay was was unsettled, and, owing to the facts that the season for cutting hay was long past and that the prairies had been burned over, it was impracticable to put up any more hay in that region before the summer of 1872. The plaintiff called a witness who was accustomed to dealing in hay, who had seen the hay in question, who knew what the supply of hay in the region was, who was acquainted with the facts upon which the demand for hay there would depend, and with the fact that the demand was such that all the hay there was used up before the grass grew in the spring of 1872, and who, during

that spring, purchased hay for parties in whose employ he was for $30.00 per ton. *Held,* that under the circumstances of the case, as above detailed, the opinion of the witness as to the value of the hay at the time of the conversion was properly received.

Action for the conversion of certain hay. At the trial in the district court for Becker county, before *Stearns, J.,* the principal questions were upon the ownership of the hay and upon its value at the time of the conversion. The exceptions taken in the latter branch of the case are stated in the opinion. In regard to the ownership of the hay there was evidence that the plaintiff—who was possessed of a complete outfit for putting up hay, and was about to engage in that business at or near the second crossing of the Cheyenne river, in Dakota territory—was engaged, with his outfit, by one Boyden, who was employed by defendant to put up 100 tons of hay for it at the same place, under the agreement that plaintiff should receive certain wages, and that, after that quantity of hay had been put up for the defendant, he might have the use of defendant's outfit in putting up hay for himself, giving defendant credit in account for the use of its outfit. There was also evidence that the hay in question was put up by plaintiff for himself, under this agreement, after the 100 tons had been put up for defendant, and was cut upon unsurveyed lands of the United States. There was also evidence that Boyden's reason for making the agreement with plaintiff was that the season was late and that the hay was liable to be destroyed by hard frost. The defendant's counsel requested the court to instruct the jury that " the evidence showed no authority on the part of Boyden to employ, hire, or contract the use of the teams, implements and men of defendant in or for the private business and speculation of the plaintiff," which instruction was refused, and the defendant excepted. The jury found a verdict for plaintiff, on which judgment was entered, and defendant appealed.

*Geo. Gray,* for appellant.

*Chas. D. Kerr* and *R. Reynolds,* for respondent.

BERRY, J.   This is an action for the recovery of damages for the conversion by defendant of eighty tons of hay, owned by, and in possession of, the plaintiff.   At the time of the alleged conversion, in the late fall and winter of 1871, the hay was in stack at the second crossing of the Cheyenne river, in the territory of Dakota, on the line of the Northern Pacific Railroad, and about sixty miles west of the Red River of the North.   Sletton, a witness called by plaintiff, testified as follows:   " I saw the hay on the ground.   *   * I have been accustomed to dealing in hay.   *   * The means I have of estimating the value of hay at the Cheyenne river, that winter and the following spring, are that I know there was no hay put up that fall west of the second crossing of the Cheyenne river, and none east nearer than twenty-five miles ; that there was an average of about twenty-five teams wintered at the second crossing of the Cheyenne, and a good deal of teaming up and down the line from Fargo to the Missouri river during the winter, with transient teams, that had to be supplied with hay from that point as far east as the second station, forty miles, and as far west as the Missouri river, 140 miles.   I bought hay myself in the spring of 1872 for Fleming, Canda & Co., for the teams in my party, after that hay at the second crossing was used up."   The witness was then asked by plaintiff's counsel : " State what, in your opinion, that hay claimed by plaintiff was worth at the time it was taken by, and under the orders of, the defendant ? "   The question was objected to by defendant's counsel " for the reason that the witness did not show any knowledge of such value at the time and place mentioned, or the market value thereof at that time and place ; that there was then and there no market value thereof, and the only measure of value was the cost of pro-ducing it."   The objection was overruled, and the witness answered : " It was worth from $25.00 to $30.00 per ton. In the spring of 1872, and before the grass grew, I paid for the hay I bought for Fleming, Canda & Co. $30.00 per ton

at the second crossing of the Cheyenne." At the time of the conversion the region of country lying between the Red River of the North, which was sixty miles east of the place where the hay was, and the Missouri river, which was 140 miles west of the same place, was unsurveyed and unsettled.

The defendant's objection, in effect, admits that there was no market value for hay at the place where the hay in question was situate, nor at any place within a distance therefrom which could be regarded as reasonable with reference to the transportation of hay from the same to the place where the hay in question was stacked. Ordinarily, and as a general rule, market value is the proper measure of the actual value of personal property. But here evidence of market value was out of the question. The case of this hay is, therefore, exceptional as respects proof of value, and, because it is exceptional, the value of the hay is to be ascertained, not under the general rule, but under such an exception to it as is necessary to prevent a failure of justice, and as will be satisfied by requiring a party to produce such evidence only of value as the peculiar circumstances of the case will reasonably permit.

Now it appears that the witness Sletton was accustomed to dealing in hay, and that he had seen the hay in question ; that he knew what the supply of hay in the region was ; that he was also acquainted with the facts upon which the demand for hay there would depend, and with the fact that the demand was such that all the hay there was used up before the grass grew in the spring of 1872, and that during that spring, before the grass grew, he purchased hay for parties in whose employ he was for the price of $30.00 per ton. Considering all the circumstances of the case—that the country was not settled ; that there was no market value for hay there, or within any reasonable distance, or, what is perhaps, equivalent, that there was no such buying and selling as would establish anything in the nature of a market price ; that the witness was accustomed to dealing in hay ;.

that he was acquainted with the supply and demand upon which the value of the hay (*i. e.*, the price which it was really worth) would mainly depend—we think the witness was properly permitted to express his opinion upon the question of value. It is difficult to see how, under the circumstances, any more satisfactory evidence was attainable. He was as much of an expert as could reasonably be expected to be found. The cost of producing the hay would certainly be a very unsatisfactory measure of value when it is considered that, at the time when this hay was converted, the production of any more until the following summer was rendered impossible by the fact that the country had all been burned over, as well as by the fact that the season for cutting hay was long past.

The objection that the facts as to demand and supply, to which the witness testified, occurred during the winter and spring *after* the conversion, also disappear when it is considered that, in the absence of any market value, and in view of the circumstance that no more hay could be produced before the ensuing summer, these facts would form an excellent, if not the very best, basis for determining what the hay was actually worth at the time of the conversion, or, in other words, what, in the ordinary course of things, would have been realized from it if the defendant had not interfered with plaintiff's possession of it.

As to the testimony in regard to the price paid for the hay bought by the witness for Fleming, Canda & Co., we think it was worth something (exactly how much might have been ascertained on cross-examination) upon the question of value. It was one instance of buying and selling, and, for anything appearing to the contrary, the only instance in the vicinity. Adding to these considerations the fact that, in a case of this kind, very much must be left to the discretion of the presiding judge, (see *Cross* v. *Wilkins*, 43 N. H. 332,) we are still further confirmed in the conclusion that the opinion of the witness should be held to have been properly received.

The views above expressed also dispose of the exception to the refusal of the court to instruct the jury upon the measure of damages, as requested by defendant.

As respects the instruction requested by defendant in regard to Boyden's want of authority, we think it was properly refused by the court, in view of the testimony as to Boyden's general and express authority to put up the 100 tons of hay for defendant, which would embrace authority to take all reasonable, necessary measures to accomplish this object, and in view of the testimony found in folios thirty-nine to forty-two of the printed case in reference to the original bargain between him and the plaintiff.

Judgment affirmed.