Fort Wayne, Cincinnati and Louisville Railroad Co. *v.* Haberkorn.

No. 1,847.

## THE FORT WAYNE, CINCINNATI AND LOUISVILLE RAILROAD CO. *v.* HABERKORN.

PATENT.—*Definition.*—A patent is a grant to the patentee, his heirs and assigns, for a stated period, of the exclusive right to make, use, and vend the invention or discovery throughout the United States.

SAME.—*Transfer of Limited Interest In.*—*License.*—A transfer of a right to make and use a patented appliance upon a particular number of machines is merely a license and not a grant of an interest in the patent.

SAME.—*Implied Contract.*—A railroad company is not entitled to the use of an invention by its master mechanic, where none of the company's material or labor entered into the discovery or perfection of the invention, and nothing belonging to the company was devoted to the construction of the appliances until after the invention had been put in definite form and patent either issued or applied for.

SAME.—*Licensee.*—*Rights of Subsequent Purchaser.*—A purchaser of a patent right takes subject to the rights of a licensee theretofore granted.

SAME.—*Measure of Damages.*—The measure of recovery by a patentee for the use of his appliance by a licensee is not the worth or value of the appliance to the licensee, but its value generally.

TRIAL.—*Special Interrogatory to Jury.*—That an answer by jury to a special interrogatory is not sustained by the evidence, does not invalidate the general verdict where the matter to which the question relates does not affect the right of recovery of the party in whose favor the verdict is rendered.

From the Allen Circuit Court.

*Morris, Bell, Barrett & Morris, W. E. Hackedorn,* and *J. B. Cockrum,* for appellant.

*W. G. Colerick,* and *L. M. Ninde & Sons,* for appellee.

GAVIN, J.—Appellee sued to recover royalties, or the value of the right to make and use certain pat-

ented appliances. The only questions argued are those presented by the motion for a new trial.

Counsel for appellant insist that the complaint is not for royalties, nor to recover the value of a license granted, but that it seeks to recover the value or price of a "transfer of a right in each patent," and that the complaint is not supported by proof of a license.

There are various paragraphs of complaint, but all are substantially similar, save that they set up different patents.

The averments in each paragraph of the complaint are, that the railroad company desired to acquire the right to make and use the various patented devices upon a specified number of cars or locomotives, and that appellee consented that it should have and acquire such right; that thereupon it attached such devices to such cars and used the same, and has become the owner of said patented right to make and use said appliances upon said specified number of cars.

The complaint counts merely upon a license granted, and not upon a transfer of an interest in the patent itself.

A patent is a grant to the patentee, his heirs and assigns, for a stated period, of the exclusive right to make, use, and vend the invention, or discovery, throughout the territory of the United States. The patentee may, by writing, assign or convey an entire or partial interest in the patent by conveying: first, the whole patent, comprising the exclusive right to make, vend, and use the invention throughout the United States; or, second, an undivided right or share of that exclusive right throughout this entire country; or, third, the exclusive right under the patent within a specified part of the United States. A transfer of either of these three kinds of interests is an as-

signment, properly speaking, and vests in the assignee a title to so much of the patent itself. Any assignment or transfer short of one of these is a mere license, giving the licensee no interest in the patent. A transfer, or a grant of the right to make and use a patented appliance upon a particular machine, or number of machines or cars, could not, then, be more than a license to so make and use it within such fixed limits. *Waterman* v. *McKenzie*, 138 U. S. 252; *Mitchell* v. *Hawley*, 16 Wall. 544; Walker Pat., section 296; 2 Robinson Pat., section 806.

It is earnestly contended that the evidence is insufficient to sustain the verdict. In our consideration of this question, it must be borne in mind that we are not called upon to determine the correctness of the amount of recovery. If the evidence justifies a finding in appellee's favor for any sum, then the verdict will repel the attack thus made.

The correctness of the amount of the recovery in actions upon contract, such as this, is only raised by the fifth specification of section 568, R. S. 1894. *Davis* v. *Montgomery*, 123 Ind. 587; *Western Assurance Co.* v. *Studebaker, etc., Co.*, 124 Ind. 176; *White* v. *McGrew*, 129 Ind. 83; *Bartlett, Exr.*, v. *Burden*, 11 Ind. App. 419.

Under the law, we are called upon, then, to determine whether or not, viewing the evidence most favorably for appellee, there is any, either direct or inferential, fairly sustaining a verdict in his favor. *Currie Fertilizer Co.* v. *Byfield*, 9 Ind. App. 180.

There is evidence to show the following state of facts: From 1883 to October, 1889, appellee was in appellant's employ as its master mechanic. He had charge of all machinery and appliances, keeping everything in order and operating the road so far as the appliances were concerned. But the duty of

selecting these things devolved upon the general manager, or superintendent, Mr. Worthington. Appellant was not, under the terms of employment, entitled to the benefit of inventions made or patented by appellee. From 1885 to 1889 appellee invented various devices, a spark-arrester, locomotive driver brake, automatic air brake, and a box-lid for car wheels, for which patents were issued to him. So far as the evidence discloses, none of the time, material, labor, or tools of appellant entered into or were used in the developing and perfecting of these inventions. The expenses attendant upon procuring the patents, perfecting the patterns, etc., were paid by appellee, and amounted to about $1,500.00. At various times, from 1885 or 1886 to 1889, these appliances were made by appellant, or under its directions, and placed upon its cars and engines, and used thereon up to 1891 at least, with the knowledge and consent, and generally under the personal supervision of appellee, but, as he says, by the express order and direction of the superintendent, who knew that he had patents therefor. Appellee declares that there was nothing said about pay or compensation at the time. He kept no book account of the appliances thus used, nor did he make any claim for pay or compensation until the matter was brought up by Mr. Worthington in 1889, a few months before both of them left this road, when Worthington expressed a wish for a written release to the company, and proposed to pay the expenses incurred by appellee, to which he agreed, asking no more. But nothing was done to effectuate and carry out that proposed arrangement. After his discharge, appellee first presented his claim to appellant in 1889. Until placed upon appellant's cars and engines, none of these appliances had been brought into actual use, nor any rights therein sold to any one. At the time

the spark-arresters were first put on, Worthington had ordered appellee to take off two then in use, as being wholly ineffective, and to replace them with others. The company had no others, and appellee so informed him, and Worthington then asked what kind to get. Appellee told him a diamond stack, but that he had a stack which he would guarantee to be far better than that. Whereupon Worthington, who knew of his patent and the plan of his arrester, said, "put one of these stacks on and see what they would do, and if they are all right we will put them on all the engines." Appellee replied, all right, and did as directed. After trial, the superintendent ordered the other nine engines equipped in like manner, and this was done as they came in for repairs.

The box-lid was put upon old cars by appellee, and also upon new cars built at Muskegon. As to these, appellee testifies that Worthington "sent down to the shop and he said, I want this journal box-lid put on these cars; he ordered me to send full samples of my patterns up there." This he did, and the cars came back equipped with his lids. It should be noted that the construction of these new cars was not within appellee's line of duty. There seems to be evidence, although some confusion exists, that Worthington's successor caused the box-lids to be put upon another lot of cars, after having asked appellee what royalty he would charge, and being informed one dollar per car.

The automatic air-brake was put upon appellant's cars after a connecting line had refused to haul its cars over its road unless provided with such brake, because the straight air-brakes thereon could not be used with the Westinghouse automatic brakes, with which that line's cars were furnished. Appellee testifies as to its introduction, that after this refusal,

and after the refusal of the president of the road to equip the cars with the Westinghouse automatic air-brakes, Mr. Worthington stated to him, "I see that you have a patent for an automatic air-brake. Is it interchangeable with the Westinghouse? I told him it was. He wanted to know whether it worked all right. I told him it would. He told me to equip a car or two." This he did, and "after those were in use Mr. Worthington requested me, or told me, to equip the entire train of cars with those brakes," and ten were so equipped.

Mr. Worthington testifies that it was stated and understood between him and appellee, at the time they were ordered, that appellant was not to pay anything for the right to use these appliances. Appellee, however, directly denies that such an agreement was made, and the verdict of the jury settles this proposition in his favor.

We have not set out all the facts and circumstances brought forth in this case, but have given sufficient to demonstrate, as we view the law, that we cannot concur in appellant's contention, that the evidence establishes, indisputably, that these appliances were placed upon appellant's cars by appellee voluntarily, simply for the purpose of introducing them to the public, without any expectation of pay on either side, and, under such circumstances as that, the law will not imply a promise to pay for them.

While there is much to indicate that such was the case, and we are ourselves strongly impressed with the reasonableness of this claim, yet we cannot assert that this is the only reasonable conclusion or inference to be drawn from all the evidence.

Counsel quote from Hare on Cont., p. 227, as a rule of law applicable here: "Where an act is done, or service rendered, in pursuance of a request, the law

will imply a promise to pay what it is worth. This rule does not apply, unless it appears, from the nature of the act, from what was said at the time, or by some other sufficient means of proof, that the parties were dealing on the basis of contract, and not of charity, friendship or benevolence." The issue between the parties was submitted to the jury, substantially in conformity with this statement of the law. The patents were valuable rights, to the use of which appellant had no legal claim. It had not contributed to their invention, nor to the procurement of the patents. The right to the use of the appliances covered by them was vested in appellee. His duty as master mechanic did not require him to surrender or grant this right to appellant. *Solomons* v. *U. S.*, 137 U. S. 342. He held these rights presumably to make a profit from them. If appellant had run out of coal, and, knowing appellee had plenty of coal, had ordered him to haul down a thousand bushels for use in the shops, and he had done so, no one would claim that appellant should not pay therefor, because he was its master mechanic, and the coal was necessary to the proper carrying on of his department, even though nothing was said about pay. The same principle is more or less applicable here. It is urged, and with much force, that Worthington's willingness to pay the expenses indicates his understanding that there was a legal liability to pay for what the company had received, because he had no right to bestow the company's money as a gratuity. Appellant ordered from appellee that which he had and which it needed. It was valuable in itself and useful to appellant. While it is said that appellee should have notified appellant of his intention to charge, and that if he had done so, a much more modest royalty would have been demanded, it may be an-

swered that appellant knew it was asking for and receiving a valuable privilege to which it had no legal claim, and for which it would, ordinarily, be required to compensate the owner; and if it thought it should not pay, and that the benefit in the way of introduction, etc., would be a fair equivalent, it should have so agreed with appellee. These are some of the views of the facts and circumstances from which it was legitimate for the jury to conclude that the law would imply a promise to pay.

That appellee's conduct, in directing and permitting these appliances to be made by appellant and placed upon its cars, created a license to make and use them thereon, cannot be gainsaid. No express grant, in so many words, was necessary for that purpose. Walker Patents, section 311, 312; *Keyes* v. *Eureka etc., Mining Co.*, 158 U. S. 150.

We deem it undoubtedly true, that there may be an implied contract for compensation arising from a license to use a patented invention, and the consequent use thereof by the licensee. *U. S.* v. *Palmer*, 128 U. S. 262; *Deane* v. *Hodge*, 35 Minn. 146.

It has been adjudged by the Supreme Court of the United States, that when one is in the employ of another, in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employes to develop and put in practical form his invention, and explicitly assents to the use by his employer of such invention, a jury or the court trying the facts is warranted in finding that he has so far recognized the obligations of service flowing from his employment, and the benefits resulting from his use of the property as to have given to such employer an irrevocable right to use such invention without liability to pay therefor. *Lane, etc., Co.* v. *Locke*, 150 U. S.

193; *Solomons* v. *U. S., supra; McClurg* v. *Kingsland,* 1 How. (U. S.) 202.

In the recent case of *Gill* v. *U. S.,* 16 Sup. Ct. Rep. 322, that court seems to have extended the principle still further in favor of the employer.

The principles asserted in these cases cannot govern here, for the reason that none of the employer's material or labor entered into the discovery or perfection of these inventions, nor was anything of the employer's devoted to the construction of the appliances, until after the invention had been put into definite form and carried to completion, and a patent either issued or applied for.

This case is distinguishable from that last cited by this fact last mentioned. In the Gill case, although the idea had taken definite shape in the inventor's brain, and had been placed upon paper, it was first put into the form of an operative machine at the employer's expense and hazard, and a number of the machines had been constructed for it by the inventor before any patent was applied for. Upon this point the learned judge repeatedly lays special stress, and, as it seems to us, rightfully so. There, up to the time the employer undertook the construction of the machine, the inventor had contributed nothing but the idea and the drawing. The employer then took hold, and by the use of his property the inventor demonstrated the practical utility of the invention. Here, however, the inventor not only contributed his ideas and plans, but they had been put into practical form, and he had expended considerable sums in perfecting them and obtaining the patent therefor, and the employer thereafter simply caused the construction of this perfected appliance for its own use and at its own expense; as it must have done had it purchased a similar right from some one else.

The subsequent conveyance of the patents, without reserving any privileges to the appellant, did not affect their rights under the license. The purchaser took subject thereto. Walker Pats., section 304; *Pratt* v. *Wilcox Mfg. Co.*, 64 Fed. Rep. 589; 2 Robinson Pats., section 817.

In answer to an interrogatory, the jury said appellee did make a charge for the right to use these devices. Neither the question nor answer fixes any time as to when the charge was made. From the references to the record made by counsel to support the position that this answer is not sustained by the evidence, they would seem to intend by "charge," an entry on the books or a bill rendered. Thus construed, the answer would have been unimportant, whether in the affirmative or negative, because neither was essential to the maintenance of appellee's case.

Appellee was permitted, over objection, to state "what it was worth to the company to be permitted to use and wear out one of these machines." In this we are of opinion that the learned trial judge was led into error. Where the patentee sues to recover for the use of his appliances from a licensee, the measure of recovery is not the worth or value of the appliance to the defendant, but its worth or value generally. If a man's needs are extreme, the value of the use of that which supplies his wants may be very large, although the article itself may be of trifling value. Where the defendant is a wrongdoer, and is infringing upon the rights of the patentee, then he may be required to pay the full value of the article to himself. There he must account for all the benefit he may have received from its use, and the plaintiff, when invoking the aid of a court of equity, is not limited to the value of the appliance. *Coupe* v. *Royer*, 155 U. S. 565; *Tilghman* v. *Proctor*, 125 U. S. 136.

Such, however, is not the rule where the remedy sought to be enforced is that given by the law merely, and not that afforded by equity. *Coupe* v. *Royer, supra.*

Here the right, and the remedy by which it is to be enforced, are those given by law strictly. The equity powers of the court are not invoked.

The licensee acquires the right to use the appliances with the consent of the patentee, with the express purpose of making its use profitable to himself. It would be highly inequitable to require him to render to the patentee all this profit. Counsel for appellee have not endeavored to justify or sustain the ruling.

The majority of the court is of the opinion that for this error the cause should be reversed.

Judgment reversed.

Filed June 12, 1896.